**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| *IN RE CROWDSTRIKE HOLDINGS, INC.*<br>*SECURITIES LITIGATION* | Case No. 1:24-cv-00857-RP<br><br>**CLASS ACTION** |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

I. INTRODUCTION ................................................................................................... 1

II. STATEMENT OF FACTS .................................................................................... 5

    A.    CrowdStrike's Falcon Platform Carried Unusually High Risks That Were Readily Identifiable To Defendants ........................................................ 5

    B.    Defendants Assured Investors And Customers That CrowdStrike's Falcon Platform Was Safe ................................................................................... 6

    C.    Unknown To Investors At The Time, Defendants Drove A Culture Of Speed Above Safety, Circumventing The Most Basic Quality Control Processes ............ 8

    D.    The Truth About CrowdStrike's Practices Is Revealed When A Faulty Falcon Update Crashes Thousands Of Computers Across The Globe, Leaving Investors, Customers, And Industry Participants Stunned ..................... 10

    E.    Investors And Customers Suffer Losses As A Result Of Defendants' Misrepresentations ................................................................................... 12

III. STANDARD OF REVIEW ................................................................................. 12

IV. ARGUMENT ........................................................................................................ 13

    A.    The Complaint Adequately Alleges False And Misleading Statements ............... 13

        1.    Defendants' Statements That CrowdStrike "Doesn't Blue Screen Endpoints With Failed Updates" Omitted The Full Truth ........................ 14

        2.    Defendants Misled Investors To Believe That CrowdStrike's Updates Were Sufficiently Tested Before Being Released ...................... 18

        3.    Defendants Misled Investors Into Believing That CrowdStrike Conducted Phased Deployments Of Its Rapid Response Updates .......... 23

        4.    Defendants Misled Investors To Believe That CrowdStrike Adhered To FedRAMP And DoD Compliance Standards .................................... 24

        5.    Defendants Misled Investors To Believe That CrowdStrike Employed A Dedicated Quality Assurance Team .................................. 26

    B.    Plaintiff Has Adequately Alleged A Strong Inference of Scienter ...................... 27

1.  Defendants' Competing Inference Based On Their Distorted Version Of The Complaint Is Not More Compelling ............................... 33

2.  Defendants' Arguments As To CrowdStrike's Website Statements Fail ............................................................................................................. 35

C.  Plaintiff Has Sufficiently Alleged Section 20(a) Claims ...................................... 35

V.  CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)................................................................................................21

*In re Apache Corp.*,
2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) .......................................................34

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)..............................................................29, 30

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ......................................................23, 29, 31

*Brody v. Zix Corp.*,
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)......................................................12

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ......................................................20, 22, 26

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*,
2016 WL 6075540 (W.D. Tex. Sept. 16, 2016)......................................................13

*In re Cobalt Int'l Energy, Inc.*,
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ..........................................................33

*Delta Air Lines, Inc. v. CrowdStrike, Inc.*,
2025 WL 1526052 (Ga. Super. Ct. May 16, 2025)................................................12

*El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*,
709 F. Supp. 3d 1296 (D. Colo. 2023).....................................................................15

*In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.*,
298 F. Supp. 2d 544 (E.D. Tex. 2004)....................................................................16

*In re Enron Corp. Sec, Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ...................................................................13

*In re Equifax Inc. Securities Litigation*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)......................................................18, 19, 25

*Fener v. Belo Corp.*,
513 F. Supp. 2d 733 (N.D. Tex. 2007) ...................................................................22

iii

*Fitzpatrick v. Uni-Pixel, Inc.*,
2014 WL 3773553 (S.D. Tex. July 25, 2014)..................................................................35

*In re Fleming Comps. Inc. Sec. & Deriv. Litig.*,
2004 WL 5278716 (E.D. Tex. June 16, 2004)............................................................27, 32

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ............................................................... *passim*

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ...................................................................................27, 28

*Hall v. Rent-A-Ctr., Inc.*,
2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ...........................................................16, 17

*Heck v. Orion Group Holdings, Inc.*,
468 F. Supp. 3d 828 (S.D. Tex. 2020) .....................................................................31

*KB Partners I, L.P. v. Barbier*,
907 F. Supp. 2d 826 (W.D. Tex. 2012).....................................................................33

*KB Partners I, L.P. v. Pain Therapeutics, Inc.*,
2015 WL 7760201 (W.D. Tex. Dec. 1, 2015) ....................................................14, 15

*In re Kosmos Energy Ltd. Sec. Litig.*,
955 F. Supp. 2d 658 (N.D. Tex. 2013) ....................................................................21

*Kunzweiler v. Zero.Net, Inc.*,
2002 WL 1461732 (N.D. Tex. July 3, 2002)........................................................15, 20, 21

*Kurtzman v. Compaq Comput. Corp.*,
2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)......................................................14

*Linenweber v. SouthWest Airlines Co.*,
693 F. Supp. 3d 661 (N.D. Tex. 2023) .............................................................16, 23

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ....................................................................... *passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)..................................................................................................15

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ....................................................................................34

*In re Michaels Stores, Inc. Sec. Litig.*,
2004 WL 7344746 (N.D. Tex. Dec. 13, 2004) ......................................................19

iv

*Miller v. Stroman*,
2020 WL 2494576 (W.D. Tex. May 14, 2020) ........................................................................34

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023)..........................................................................33

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ...........................................................................................27, 28

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ........................................................................................ *passim*

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ................................................................................................33

*In re Plains All American Pipeline, L.P. Securities Litigation*,
307 F. Supp. 3d 583 (S.D. Tex. 2018).  .................................................................... *passim*

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ................................................................................................31

*In re Rocket Fuel, Inc. Sec. Litig.*,
2015 WL 9311921 (N.D. Cal. Dec. 23, 2015).......................................................................35

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)..................................................................16, 22

*Schulze v. Hallmark Fin. Servs., Inc.*,
2021 WL 3190529 (N.D. Tex. July 28, 2021) .......................................................................32

*In re SolarWinds Corp. Sec. Litig.*,
595 F. Supp. 3d 573 (W.D. Tex. 2022).................................................................... *passim*

*In re Spear & Jackson Sec. Litig.*,
399 F. Supp. 2d 1350 (S.D. Fla. 2005) .................................................................................30

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ...................................................................................... *passim*

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)...............................................................................15, 28

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................................27, 28, 34

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .......................................................................25

*In re Venator Materials PLC Sec. Litig.*,
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ............................................................... *passim*

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ..................................................................................17

*Wieland v. Stone Energy Corp.*,
    2007 WL 2903178 (W.D. La. Aug. 17, 2007).........................................................21

## STATUTES & OTHER AUTHORITIES

Securities Exchange Act of 1934:

    § 20(a), 15 U.S.C. §78t(a).......................................................................................35

    § 21D(b)(1), 15 U.S.C. § 78u-4(b)(1)(B)................................................................13

Fed. R. Evid. 801(d)(2)(A) .............................................................................................32

Fed. R. Civ. P.:

    Rule 9(b) ...................................................................................................................13

    Rule 12(b)(6)............................................................................................................12

    Rule 15(a).................................................................................................................36

Securities and Exchange Commission Rule 10b-5,

    17 C.F.R. § 240.14a-9(b) ..................................................................................13, 15

## I.    INTRODUCTION

This case arises from Defendants' misrepresentations and omissions about CrowdStrike's cybersecurity platform, Falcon, and its "Rapid Response" updates. Defendants told investors that CrowdStrike carefully vetted its updates and ensured Falcon "***doesn't blue screen endpoints with failed updates***," i.e., cause a crash of systems running Falcon. ¶48.[1] CrowdStrike, along with its CEO, Defendant Kurtz, and its President, Defendant Sentonas, represented that its updates were thoroughly tested in a pre-production environment, carefully deployed through phased rollouts, and fully compliant with Federal Risk and Authorization Management Program ("FedRAMP") and Department of Defense ("DoD") requirements.

Behind the scenes, however, Defendants covertly disregarded the basic, industry-standard precautions to which they professed to adhere, all in an effort to maintain what they viewed as their key competitive advantage: being first to market with their updates. This severely reckless behavior caused the largest IT outage in history, when a failed Falcon update crippled CrowdStrike's customers. ¶77. As news emerged that this outage was caused by CrowdStrike's failure to implement rudimentary testing and quality assurance measures, industry experts widely condemned the Company, stating that they were "***astounded***" and "***slack jawed in horror***" by Defendants' violation of industry standards that even "***[f]irst-year programming students***" understood to be the minimum. ¶¶80, 92. They noted that "***CrowdStrike has made intentional architectural, engineering, and QA decisions that made this happen***," and it was "***fundamentally economics***" for CrowdStrike to forgo these basic quality control measures. ¶81. In response, CrowdStrike's stock price collapsed, inflicting large losses on its investors, including public

---

[1] Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted. References to "¶_" are to the Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 41 ("Complaint"); references to "MTD" are to the Defendants' Motion to Dismiss, ECF No. 47 and references to " D.Ex." are to the exhibits cited in the MTD.

pension funds, like Lead Plaintiff, who invested in the stock for their beneficiaries.

The Complaint satisfies the pleading requirements. The Complaint is backed by the detailed accounts of nine former CrowdStrike employees, who uniformly recounted how the quality control practices at CrowdStrike differed starkly from Defendants' representations. It is also supported by dozens of industry experts and journalist reports, which described how, at CrowdStrike, "*quality control was not really part of [the] process or [the] conversation*." ¶64. Additionally, it is supported by the Company's own admissions immediately following the IT outage, including that CrowdStrike got things "*horribly wrong*" in failing to test and roll out its Falcon updates. ¶93. Importantly, Defendants *do not contest that they knew* CrowdStrike shirked these basic testing and rollout protocols, and instead argue (incorrectly) that their actions were justified. *See, e.g.*, MTD at 5 n.3. These facts—along with the others detailed in the Complaint— support a strong inference that Defendants knew or, at minimum, were severely reckless in not knowing, that CrowdStrike's representations were materially misleading.

Faced with the Complaint's well-pleaded allegations, Defendants resort to an alternative narrative that diverges from both the Complaint and reality. The centerpiece of Defendants' purported defense is their self-serving and highly fact-intensive assertion that their Class Period statements about "testing" are not actionable because Rapid Response updates are supposedly "configuration data," "not software or code," and thus no reasonable investor could have understood their statements to concern the Rapid Response updates. MTD at 4, 17. This argument fails for several reasons. First, Defendants never limited their Class Period statements to "software," as distinct from "configuration data." Instead, they asserted broadly that "*we test more than anyone else*," "*we always do canary deployments*," and CrowdStrike's "*agent cloud architecture … doesn't blue screen endpoints with failed updates*." ¶¶46-49, 122. Second, Kurtz

himself recognized that the defective Rapid Response update *was* "software," admitting publicly that the "update had a *software* bug in it." ¶78. Defendants' post-hoc distinction between "configuration data" and "software" is unsupported, and falls woefully short of showing as a matter of law that a reasonable investor would have understood the two to be completely different. *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 690 (5th Cir. 2014) ("industry-specific and inherently fact-bound proposition[s] cannot be verified on the face of the pleadings").

Defendants contend that the Complaint takes their statements "out of context." MTD at 8-9, 18. But Defendants unequivocally told investors that "[our] agent cloud architecture ensures that every agent is always up to date with the latest protection[,] … doesn't require a massive tuning burden *and doesn't blue screen endpoints with failed updates*." ¶¶48, 122. Defendants identify no missing "context" for this statement because none exists. In making this representation, Defendants had a duty to disclose, but omitted, that CrowdStrike (i) conducted no pre-production testing; (ii) avoided industry-standard phased roll-outs; and (iii) as a result of these failures, created a severe risk of "blue screen[ing] endpoints with failed updates." *See Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 956 (S.D. Tex. 2021) ("Whenever a defendant voluntarily chooses to speak publicly, he or she has a duty to tell the whole truth, and must disclose material, adverse facts that affect the validity or plausibility of his statement.").

Defendants also attempt to rewrite their statements' meaning, urging the Court to adopt their self-serving interpretations as a matter of law at the pleading stage. For instance, they argue that Kurtz's statement to investors that "[w]e test more than anyone else" referred only to third-party testing, not CrowdStrike's own. MTD at 20. But Kurtz's statement referenced CrowdStrike's testing ("*We* test"). ¶46. And *even if* Kurtz's statement somehow could be construed as limited exclusively to third-party testing, it remains misleading without disclosing that CrowdStrike itself

3

did not conduct basic testing. Similarly, Kurtz's statement to investors that Falcon's software ensures "code is secure, that it's deployed and that it's run in a secure environment" is misleading, *even if* interpreted as referring only to customers' use of the Falcon software. *Id.* It remains misleading to tout Falcon's capabilities to ensure customers' code is "run in a secure environment" without disclosing that Falcon's code *itself* is insecure. The fact question of how reasonable investors understood Defendants' statements "can only be answered based on the evidence produced during a later stage of this litigation." *Spitzberg*, 758 F.3d at 689.

Defendants also argue that their statements assuring investors that CrowdStrike was "meeting the stringent requirements" of FedRAMP and DoD were true because it was "authorized by both FedRAMP and DoD." MTD at 7. But whether CrowdStrike was "authorized" by both agencies says nothing about whether it was, in fact, "*meeting* the[ir] stringent requirements." The evidence is plain that it was not, rendering Defendants' statements false and misleading.

The Complaint is also packed with allegations that support the scienter inference that Defendants knew or, at minimum, were severely reckless in not knowing the true facts. As detailed in the Complaint: (i) Falcon and its concomitant Rapid Response updates were CrowdStrike's only product; (ii) Defendants made specific, unequivocal misrepresentations about CrowdStrike's updates, assuring investors that Falcon "doesn't blue screen endpoints with failed updates"; (iii) Defendants knew that investors and customers were acutely focused on their representations about testing and quality assurance, as the deployment of even a single faulty Rapid Response update would wreak havoc on its customers' systems and CrowdStrike's bottom-line; (iv) while on their watch, Kurtz and Sentonas previously released a faulty update without necessary testing, with Kurtz assuring investors that they had "learned this lesson at ... McAfee"; (v) CrowdStrike's testing and quality assurance deficiencies were egregious and obvious to anyone who cared to

4

look; and (vi) Defendants, themselves, recognized the gravity of their wrongdoing, admitting to investors after the Class Period that they "***acted horribly wrong***." ¶¶86, 97-115.

Defendants contend that the Complaint does not raise an inference of scienter because they did not personally "profit" from their misstatements. MTD at 27-28. But this argument ignores Supreme Court and Fifth Circuit precedent holding that it is a "mistake[]" to focus on "the presence or absence of a pecuniary motive" because "a strong inference of severe recklessness," which "does not depend on [motive]," is sufficient. *Spitzberg*, 758 F.3d at 685. Here, Defendants recklessly disregarded anything that got in the way of maintaining CrowdStrike's edge—the speed with which it could update Falcon—including the basic requirements for testing and safely releasing its updates.

For these reasons and those discussed below, Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    CrowdStrike's Falcon Platform Carried Unusually High Risks That Were Readily Identifiable To Defendants

CrowdStrike has one product: the Falcon cybersecurity software platform. ¶¶6, 20. CrowdStrike rose to prominence by differentiating Falcon from its competitors in three ways:

***Rapid Response updates.*** Defendants emphasized that Falcon kept its customers' computers safe through automatic "Rapid Response updates" that incorporated the latest threat detection data into the Falcon software. ¶¶20-23. Rapid Response updates were central to the value proposition of CrowdStrike's sole product and thus its stock price. *Id.*

***No reboots required.*** Kurtz stressed to investors that he knew just "how hard it is for big companies to keep [software] up to date" when "[t]hey have to reboot their systems and [the] operational impact." ¶¶20-23, 32. Defendants assured investors that, unlike updates for other platforms, Rapid Response updates could be implemented without any reboots. ¶¶20-23.

5

***Operating in the "kernel."*** Defendants touted, as another "clear advantage," that Falcon ran in the "kernel" of a computer—the heart of a computer's operating system. ¶¶26-30. This meant that Falcon had vastly greater permissions and access to computers' central operating systems than other cybersecurity software platforms. ¶27.

But for all its purported competitive advantages, the Falcon platform came with risks that, if not properly managed, could be devastating. Industry experts have long cautioned that if companies like CrowdStrike fail to adhere to certain basic, industry-standard quality control measures, remote updates like Rapid Response "pose a greater risk" than even the cybersecurity threats they are designed to prevent. ¶24. These risks were known to Defendants and particularly heightened with Falcon, as the introduction of a single failed update would crash all of its customers' operating systems, resulting in "blue screen" outages. ¶¶28-30.

### B.      Defendants Assured Investors And Customers That CrowdStrike's Falcon Platform Was Safe

Because CrowdStrike's customers included organizations that served vital functions, a widespread blue screen crash would have catastrophic consequences. ¶¶30-32. For Kurtz and Sentonas, these consequences were far from abstract. Prior to their time at CrowdStrike, they were executives at another cybersecurity company, McAfee, where they oversaw the rollout of a faulty update that had evaded testing and ultimately caused blue screen crashes that disrupted thousands of customers' business operations and caused substantial financial losses. ¶¶45-46.

Recognizing investor concern about the risk of widespread computer crashes from faulty updates, Kurtz vowed to CrowdStrike investors that he had "***learned this lesson at ... McAfee***" and understood the devastating consequences of customers needing to "***reboot 300,000 endpoints***." *Id.* To further assuage investor concern, Defendants told the market that they understood that preventing blue screens—that Falcon "simply just works"—was "***one of the most***

*important things*" to CrowdStrike's customers. ¶¶47-49. Defendants went so far as to specifically state that CrowdStrike "*doesn't blue screen endpoints with failed updates*." *Id.*

In addition to specifically representing that CrowdStrike's updates do not cause blue screens, Defendants assured the public that CrowdStrike would prevent those blue screens through employing certain, basic, industry-standard quality control practices. First and foremost, it is essential and standard in the industry for software companies to test updates in a "pre-production environment"—i.e., test the updates internally under real-world conditions before rolling them out to customers. ¶¶34-37. Defendants represented that "*[t]esting and validation is really important*" at CrowdStrike and that the Company "*test[ed] more than anyone else*" and made "*sure that code is secure*" and "*run in a secure environment*" before being deployed to customers' operating systems. ¶¶45-46. Defendants further assured investors that CrowdStrike's testing would prevent "*insecure code … [from] being put into the [update] pipeline*." *Id.*

It is also well established that software companies should deploy any new updates through "phased rollouts," also referred to as "canary rollouts"—i.e., a gradual release of updates "to a smaller cohort of users." ¶¶41-42. Throughout the Class Period, Defendants represented to investors that, consistent with the industry-standard practice, "for system stability, *we always do canary deployments of new services before rolling out changes to the entire fleet*." ¶¶42, 49.

These measures were so critical to safe software development that they were codified in the National Institute of Standards and Technology ("NIST")—the preeminent framework designed to manage cybersecurity risks—and prerequisites to doing business with branches of the U.S. government, which was one of CrowdStrike's key markets. ¶¶40, 55. FedRAMP and the DoD both incorporate components of NIST SP 800-53. ¶¶37, 40, 55, 84. Among other things, compliance with these federal standards *requires* that cybersecurity companies doing business

with the federal government: (i) test updates in an "environment" that "mirror[s] the configurations in the operational environment … so that the results of the testing are representative of the proposed changes to the operational systems"; and (ii) roll out updates in "canary deployments … [to] determine if [the new feature] should be made widely available, or if the feature needs to be re-worked" before a wider release. ¶42. Recognizing the importance of compliance with these requirements, Defendants assured investors that CrowdStrike "*[met] the stringent requirements*" of FedRAMP and "*[met] the … compliance requirements*" of the DoD. ¶¶53-54.

### C.  Unknown To Investors At The Time, Defendants Drove A Culture Of Speed Above Safety, Circumventing The Most Basic Quality Control Processes

Unfortunately for investors, CrowdStrike's meteoric rise was fueled by misrepresentations. Defendants took an undisclosed, reckless gamble: they discarded the basic, industry-standard quality control practices to maintain what they perceived as Falcon's competitive edge. The undisclosed trade-off to this gamble was that updates to the Falcon platform were not tested in pre-production environments and were not rolled out in phases. ¶¶60-61, 68-69. Consequently, if CrowdStrike accidentally built a flawed update, they would not know whether it would crash the Microsoft boot process—i.e., cause a blue screen—until it was already loaded onto (and crashing) computers worldwide. ¶62. Furthermore, instead of crashing just a few computers in an early phase release of the update, and then stopping wider dissemination, the lack of phased rollouts would mean that it was already too late, systemwide, and for all customers. ¶68.

Numerous CrowdStrike former employees ("FEs"), including those involved in developing CrowdStrike's software and updates, have confirmed that, contrary to Defendants' representations, the Company did not properly test its updates, did not conduct phased releases of updates, and, overall, lacked basic quality assurance measures common to the industry. ¶¶59-76. These FE accounts are corroborated by an exposé authored by investigative journalists at *Semafor* following

the Class Period. ¶75. And these accounts are further corroborated by the events that occurred at the end of the Class Period, CrowdStrike's own post-Class Period admissions, and the assessments of industry experts concerning the causes of those events. ¶¶77-96.

FE 1, a Senior Technical Operations Engineer at CrowdStrike who during the Class Period was "responsible for testing of the forensic system for Falcon," explained that CrowdStrike did not test whether updates would affect a Microsoft Windows machine's boot process, which, based on his ten years of experience as a test engineer, stood out to him. ¶¶62, n.67. Likewise, FE 2, a Senior Network Engineer who during the Class Period "managed the internal networking and security wireless infrastructure for the Company," reported that, if CrowdStrike had tested its software updates in a pre-production environment, it would have caught errors, like the faulty update that caused a mass IT outage. ¶¶63, n.68. FE 2 also explained that it is standard practice in the industry to test in a pre-production environment—regardless of whether the update was new code or a new definition file—and that only *after* the July 19 outage was he instructed to set up a lab with Microsoft Windows machines to conduct pre-production testing. ¶63.

Lead Counsel also spoke with Jeff Gardner, a former CrowdStrike employee quoted in the *Semafor* exposé, who explained that CrowdStrike's failure to conduct necessary testing was long-standing. ¶¶64-65. Mr. Gardner added that, at CrowdStrike, there was a "complete lack of QA process" and that "quality control was not really part of our process or our conversation." *Id.* He further explained that, at CrowdStrike, there were no checks in place to ensure the software his team worked with was tested in a staging environment before being released to customers. *Id.*

Also contrary to industry standards and its representations to investors, CrowdStrike did not conduct phased rollouts of its software updates—a fact confirmed by FEs 1, 2, and 3. ¶68. As FE 2 explained, the standard practice in the industry is to employ a canary rollout, with updates

9

first deployed to a subset of customers and then monitored. *Id*. But CrowdStrike did none of this.

Further corroborating these accounts, the *Semafor* report identified "[a]lmost two dozen former software engineers, managers and other staff [at CrowdStrike who] described a workplace where executives prioritized speed over quality, workers weren't always sufficiently trained, and mistakes around coding and other tasks were rising." ¶75. FEs also confirmed that CrowdStrike circumvented basic quality control measures because they were incompatible with the culture driven by Defendants of prioritizing speed above the safety of its software updates. ¶¶71-73.

Recognizing the dangers of CrowdStrike's deficient testing and quality control practices, former CrowdStrike employees sounded the alarm during the Class Period. Among others, FE 5, a Provisioning Engineer at CrowdStrike who assisted with software development and patching faulty software updates (¶70 n.79), sent a video message directly to Kurtz and Sentonas during the Class Period, warning them about understaffing issues he had observed, including for key support and engineering teams, which left critical issues unaddressed. ¶74. When his concerns were ignored, FE 5 resigned. *Id.* Numerous other software engineers, as reported by *Semafor*, also "complained about rushed deadlines, excessive workloads, and increasing technical problems to higher-ups for more than a year before [the] catastrophic failure of its software paralyzed airlines and knocked banking and other services offline for hours." ¶75.

> **D.     The Truth About CrowdStrike's Practices Is Revealed When A Faulty Falcon Update Crashes Thousands Of Computers Across The Globe, Leaving Investors, Customers, And Industry Participants Stunned**

The consequences of CrowdStrike's failure to adhere to basic testing and quality control requirements were revealed on July 19, 2024. ¶77. That day, CrowdStrike released a faulty Rapid Response update to all of its customers, causing the largest IT outage in history and crippling the operations of hospitals, airlines, law enforcement agencies, and Fortune 500 companies. *Id.* Belying Defendants' assertions that the outage did not concern "software" updates (MTD at 4-5),

Kurtz publicly admitted that the "update had a *software bug* in it." ¶78.

Industry experts explained that CrowdStrike pushed the faulty update out in "*a very irresponsible way*" and the outage could have easily been prevented, noting that "[i]f they had tested [the update], they would have found that this update bricks Windows 10 machines and causes the [blue screen]." ¶¶78-80, 83. Indeed, it was "*amazing*" that the CrowdStrike update "*never touched an actual running Windows machine*" before it was released, and it was "*especially surprising* [] that CrowdStrike didn't carry out staged rollouts of this update" because if it had, it could have "*caught this before it became a disaster*." ¶¶82-85.

Industry experts also noted how "eerily similar" the CrowdStrike outage was to the outage at McAfee—also under Kurtz's and Sentonas's watch. ¶102. They explained that "the parallels between that [McAfee] incident and [the] CrowdStrike outage are *uncanny*," expressing shock at "*how Kurtz, with all his experience, let something like this happen <u>again</u> at CrowdStrike*." *Id.*

For industry participants, the explanation was clear: "*CrowdStrike has made intentional architectural, engineering, and QA decisions that made this happen*," and it was "*fundamentally economics*" for CrowdStrike to forgo these basic quality control measures for the sake of maximizing profits. ¶¶81-83. Indeed, no other explanation made sense: because the widespread, catastrophic crash could have been prevented with the most basic testing and rollout procedures, the "narrative" that this outage "could happen to anybody is false." *Id.*

In its post-mortem Preliminary Post Incident Review ("PIR"), CrowdStrike stated that it would, *for the first time*, start conducting the very pre-production testing Defendants had told investors it was conducting throughout the Class Period. ¶91. The PIR also stated that, notwithstanding Defendants' representations that CrowdStrike "*always*" conducted phased rollouts, the Company would *begin* to "[i]mplement a staggered deployment strategy for Rapid

11

Response Content." *Id.* The PIR, which itself was sugar-coated and did not reveal the full truth, confirmed that "the most basic forms of quality review and assurance were not being correctly carried out" at CrowdStrike, leaving industry experts "***slack jawed in horror***." ¶92.

### E. Investors And Customers Suffer Losses As A Result Of Defendants' Misrepresentations

Defendants' misstatements and omissions caused immense harm to investors. Analysts immediately connected the July 19 outage to CrowdStrike, calling the outage "***self-inflicted***." ¶157. The day of the outage, CrowdStrike's stock fell $38.09 per share, and it continued to plummet over the next days—causing a nearly ***32%*** decline in total. ¶89.

Underscoring the importance of Defendants' Class Period representations, Delta Air Lines—one of CrowdStrike's largest and most sophisticated customers—filed a $500 million lawsuit against the Company, documenting how CrowdStrike lied to Delta and the public. ¶95. As Delta explained, "CrowdStrike caused a global catastrophe because it ***cut corners, took shortcuts, and circumvented the very testing and certification processes it advertised, for its own benefit and profit***." *Id*. In the *Delta Action*, the court recently sustained Delta's claims against CrowdStrike, finding that "Delta has stated a claim for fraud."[2]

### III. STANDARD OF REVIEW

Motions to dismiss securities actions are "viewed with disfavor and are rarely granted," and courts must "accept all factual allegations in the complaint as true" and "must also draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "[I]n the context of securities fraud, a dismissal pursuant to Rule 12(b)(6) is difficult to obtain since such a claim revolves around fact-specific inquiries." *Brody v. Zix Corp.*, 2006 WL 2739352, at *2 (N.D. Tex. Sept. 26, 2006). "The sole issue before the Court at this time

---

[2] *Delta Air Lines, Inc. v. CrowdStrike, Inc.*, 2025 WL 1526052 at *16 (Ga. Sup. Ct. May 16, 2025).

is whether the claims in Plaintiff's Complaint are adequately *alleged*, not whether the claims are likely to survive a motion for summary judgment following discovery." *Anadarko*, 514 F. Supp. 3d at 957. Dismissal is only appropriate "if the court can determine with certainty that the plaintiff cannot prove any set of facts that would allow relief under the allegations in the complaint." *City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 2016 WL 6075540, at *2 (W.D. Tex. Sept. 16, 2016).

The PSLRA does not "raise the pleading burdens [under Rule 9(b)] to such a level that facially valid claims ... must be routinely dismissed." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214 (5th Cir. 2023). It is merely "a mechanism for winnowing out suits that lack a requisite level of specificity. It was not meant to let business and management run amuck to the detriment of shareholders." *In re Enron Corp. Sec, Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 593 (S.D. Tex. 2002).

## IV.    ARGUMENT

### A.    The Complaint Adequately Alleges False And Misleading Statements

Plaintiff has adequately alleged that Defendants made false or, at minimum, misleading statements about CrowdStrike's testing and quality assurance processes. At the pleading stage, a plaintiff need not prove falsity, but instead must only "specify each statement alleged to have been misleading" and state "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). "Whether or not any of these allegations can be proven during later stages of this litigation" is not relevant to the inquiry. *Spitzberg*, 758 F.3d at 691.

Importantly, "the disclosure required by the securities laws is measured ***not*** by literal truth, but by the ability of the statements to accurately inform rather than mislead." *Lormand*, 565 F.3d at 248. Under Rule 10b–5, "a duty to speak ***the full truth*** arises when a defendant undertakes a duty to say anything." *Six Flags*, 58 F.4th at 217. "Whenever a defendant voluntarily chooses to speak publicly, he or she has a duty to tell ***the whole truth***, and ***must*** disclose material, adverse

13

facts that affect the validity or plausibility of his statement." *Anadarko*, 514 F. Supp. 3d at 956.

### 1.    Defendants' Statements That CrowdStrike "Doesn't Blue Screen Endpoints With Failed Updates" Omitted The Full Truth

As detailed in the Complaint, Sentonas told investors that CrowdStrike "***doesn't blue screen endpoints with failed updates***." ¶122. Later in the Class Period, Kurtz touted to investors that CrowdStrike's Falcon platform "***fix[es]***" blue screens, including for airlines. ¶¶128-31. These statements were critical to CrowdStrike's customers and, thus, its investors, as blue screens render their customers' computer systems inoperable and cripple their operations. ¶¶28-30.

Defendants' representations were false, misleading, and omitted material facts. In making them, Defendants were obligated—but failed—to disclose the full truth that CrowdStrike: (i) did not conduct the pre-production testing of updates needed to prevent blue screens (¶¶68-69, 90-95); (ii) did not employ phased rollouts of updates, which are essential to ensure flawed updates do not cause wide-spread blue-screens (*id.*); and (iii) created a heightened risk of blue screens by prioritizing speed over safety of updates (¶¶60-61, 67, 71-75). *See Kurtzman v. Compaq Comput. Corp.*, 2000 WL 34292632, at *22-23 (S.D. Tex. Dec. 12, 2000) ("[O]nce a company makes a disclosure … the company is under a duty to speak the full truth.").

Defendants' excuses for failing to disclose the full truth fail. ***First***, Defendants contend that Sentonas was merely stating a purportedly historical fact that a failed update ***hasn't*** caused a blue screen. MTD at 18. But this contention ignores Sentonas's words, which were ***not*** limited to the past—he said that Falcon "***doesn't*** blue screen endpoints with failed updates." ¶122. Sentonas was then required, but failed, to disclose the "full truth," including CrowdStrike's failure to test its updates and lack of quality assurance. *See KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 2015 WL 7760201, at *9 (W.D. Tex. Dec. 1, 2015) (statements "paint[ing] an incomplete and misleading picture by failing to reference" problems are actionable); *Lormand*, 565 F.3d at 249

14

(having chosen to speak on a topic, "they had a duty to disclose a 'mix of information' that is not misleading").

Equally baseless is Defendants' assertion that, to be actionable, Sentonas's statement needed to be framed as a "*guarantee*." MTD at 18. As a factual matter, Sentonas's statement *was* framed as a guarantee: he unequivocally told investors that Falcon "***doesn't*** blue screen endpoints with failed updates." And as a legal matter, a misstatement about the capabilities of a product is actionable, including by omission, even if not framed as a "guarantee." *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 597 (W.D. Tex. 2014) ("Statements about the present strength of the company and of its product" are actionable); *see also Pain Therapeutics*, 2015 WL 7760201, at *11 (misleading statement does not need to be a "guarantee"); *El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*, 709 F. Supp. 3d 1296, 1340 (D. Colo. 2023) (same). Indeed, the Supreme Court has unequivocally held that even "half-truths" are actionable, which demonstrates that a "guarantee" is not required. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024).

***Second***, Defendants contend that Kurtz's statements that Falcon "fix[es]" blue screens are inactionable because he did not explicitly refer to software updates. MTD at 14-15. This distorts Plaintiff's allegations and ignores the law. By touting that Falcon "fixes" blue screens when Falcon actually ***causes*** blue screens with untested updates, Kurtz misled investors. *Kunzweiler v. Zero.Net, Inc.*, 2002 WL 1461732, at *10 (N.D. Tex. July 3, 2002) ("Rule 10b–5 creates a statutory duty to speak the full truth when a defendant undertakes to say anything in the first place."). Defendants also assert that Kurtz's "fixes" statements were inactionable because, according to Defendants' say-so, the statements exclusively concerned Falcon IT. MTD at 14-15. This argument overlooks that Falcon IT, like all CrowdStrike's products, is part of the Falcon platform.

15

And **all** customers who purchased products within the Falcon platform—including Falcon IT—were subject to the **same** untested updates and the **same** risk of blue screens from a failed update. Defendants' arguments to the contrary, at most, raise a factual dispute as to what a reasonable investor would understand—an inquiry that cannot be resolved on the pleadings. *See Spitzberg*, 758 F.3d at 681, 689 (assertion "that no investor would understand or did understand" a statement could "only be answered based on the evidence produced during a later stage of th[e] litigation"); *In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 559 (E.D. Tex. 2004) ("The [c]ourt will not resolve a fact issue regarding how the market interpreted [the allegedly misleading] statements at this stage of the proceedings.").[3]

**Third**, Defendants incorrectly assert that their former employees' accounts cannot be credited at the pleading stage because they are not identified by name. MTD at 11-12. "Confidential witness accounts are a permissible basis on which to allege falsity." *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *23 (E.D. Tex. Oct. 19, 2017). A complaint need only set forth "details … including their job descriptions, individual responsibilities …, and specific employment dates." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *11 (S.D. Tex. Mar. 27, 2019); *Rent-A-Ctr.*, 2017 WL 6398742, at *23 (same). The Complaint includes the precise information required by the Fifth Circuit for each of the FEs—including their titles, job responsibilities, and dates of employment—and some of the former employees are identified by name. ¶¶60-76. The Complaint also describes the basis of knowledge for each of them including,

---

[3] Defendants' argument further ignores that Kurtz's statements specifically touted how Falcon "***fixes***" bluescreens for "***airlines***," which were among CrowdStrike's largest customers and most vulnerable to the consequences of blue screens. ¶¶110, 153. Indeed, when CrowdStrike's failed update bluescreened all of its customers, airlines were among the hardest hit, with Delta now suing CrowdStrike—in a sustained complaint—for having falsely "tout[ed] compliance with operating system requirements" and engaging in "uncertified and untested shortcuts that damaged and impaired its clients' systems." ¶95.

for example, how FE 1 was "responsible for testing of the forensic system for Falcon" (¶62 n.67) and how FE 2 "managed the internal networking and security wireless infrastructure." ¶63 n.68. Defendants' challenges to the veracity of these accounts is not a basis for dismissal at this stage.

Additionally, the FE accounts are consistent with each other and corroborated by additional facts. *See Six Flags*, 58 F.4th at 209 n.11 ("[T]he corroborative nature of other facts alleged, including from other sources" supports crediting the FE accounts). The FE accounts are corroborated by: (i) the *Semafor* investigative report, which itself is based on interviews of two dozen former CrowdStrike employees (¶¶64-65, 75); (ii) the accounts of numerous industry experts, who explained that if CrowdStrike had tested the update "on *one machine* … *one time* before sending it out, this would not have happened" (¶¶69, 80-86); and (iii) CrowdStrike's apologies for acting "horribly wrong" and admissions that it failed to test Rapid Response updates in a pre-production environment and to deploy the updates through a "phased rollout." ¶¶90-96.

Defendants also urge the Court to disregard the accounts of FEs 1, 3, and 4 because they left CrowdStrike shortly before the IT outage. MTD at 12. But each of them worked at CrowdStrike *during* the Class Period and, accordingly, have knowledge of the absence of testing. ¶¶62, 67, 70. Additionally, their accounts are consistent with and corroborated by FE 2, who worked for CrowdStrike until *after* the IT outage (¶63 n.68), as well as CrowdStrike's post-Class Period admissions. ¶¶91-94; *Rent-a-Ctr.*, 2017 WL 6398742 at *24 (crediting employee accounts that "independently corroborate one another's statements"). In any event, courts regularly credit the accounts of former employees, even when they do not work at the company in question for the entire class period. *See, e.g.*, *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) (FE accounts "from before the class period [are] relevant" and "confirm what a defendant should have known during the class period"). Defendants also suggest that the FE accounts must be disregarded

17

because they did not have "direct contact" with Kurtz and Sentonas; but that is not the law. *See Six Flags*, 58 F.4th at 215-16 & n.18 (rejecting argument that FEs must have "contacts" with Defendants because "[a] confidential witness does not need to be a fly on every relevant wall"); *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 583, 587 (W.D. Tex. 2022) (crediting FE accounts even when they did not "communicate[] their concerns … to any [of] the defendants").

### 2. Defendants Misled Investors To Believe That CrowdStrike's Updates Were Sufficiently Tested Before Being Released

Defendants also misled investors during the Class Period by touting the thoroughness of CrowdStrike's testing protocols, leading investors to believe that CrowdStrike: (i) "test[ed] more than anyone else, more than all of our next-gen competitors, more than other players that are out there" (¶120); (ii) ensured that "code is secure, that it's deployed and that it's run in a secure environment" and that "insecure code" could be identified before "being put into the [update] pipeline" (¶¶124, 126); (iii) tested Falcon updates "in non-production environments" before "roll[ing] them out" (¶132); and (iv) deployed Falcon updates to a "staging environment that closely resembles the production environment" (¶145).

Defendants' statements touting their "testing" were false or, at minimum, misleading. In making these statements, Defendants were duty-bound to disclose the "whole truth," including that CrowdStrike did not conduct any pre-production testing of updates. Courts have repeatedly held that similar statements are actionable. For example, in *SolarWinds*, the Court found actionable defendants' statements touting its "password policy," without disclosing that defendants, in truth, permitted easy-to-guess passwords, including "solarwinds123." 595 F. Supp. 3d at 587-88. Likewise, in *In re Equifax Inc. Securities Litigation*, the court found actionable defendants' statements touting its "intrusion testing" when it did not disclose that, in truth, its testing and assessments were "superficial." 357 F. Supp. 3d 1189, 1221-22 (N.D. Ga. 2019).

18

In response to the Complaint's well-pleaded allegations, Defendants improperly urge the Court to adopt their own counter-factual narrative and ignore settled law. Their attempt fails.

*First*, Defendants contend that the Court should find, as a matter of law at the pleading stage, that their testing statements were "true" because the update to the Falcon platform software that caused the July 19 outage was not a "software update," but rather a "content update." But as a factual matter, Falcon's Rapid Response updates *were* "software updates." The updates are part-and-parcel of the Falcon software platform: they update the software platform as to new threats to detect and were a key feature of the Falcon platform. ¶¶21-23. In fact, Kurtz admitted on television that the IT outage was caused by "*a software bug*." ¶78. Investors also understood the outage to have been caused by a "software" update, with analysts at J.P. Morgan concluding that the "outage issues related to a *software update*." *See, e.g.*, ¶87. Moreover, Defendants fail to explain any meaningful difference between "software" and "configuration" data, and why investors would understand different testing processes to apply to each. Indeed, even according to Defendants' own self-serving definition, "Rapid Response Content updates" provide the "latest instructions" to the Falcon software and modify its behavior—i.e., they *are* software updates. MTD at 4.

As a legal matter, Defendants' argument also fails. Defendants' post-hoc characterization of Rapid Response updates is drawn from self-serving snippets from extrinsic material created *after* the IT outage. As discussed in Plaintiff's Opposition to Defendants' Request for Judicial Notice, courts repeatedly reject the use of extrinsic documents to "disprove the Complaint's factual allegations." *In re Michaels Stores, Inc. Sec. Litig.*, 2004 WL 7344746, at *3 (N.D. Tex. Dec. 13, 2004); *SolarWinds*, 595 F. Supp. 3d at 578 n.1 (same). At most, Defendants raise a factual dispute about whether Rapid Response updates were "software" or "content" and whether a reasonable investor would understand it as such—disputes unfit for resolution at this stage. *See In re Venator*

*Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 656 (S.D. Tex. 2021) (differing investor interpretations must be "resolve[d] … with evidence at a later stage"); *Kunzweiler*, 2002 WL 1461732, at *10-11 (whether "a reasonable investor, in the exercise of due care, would have received a false impression from the statement" is "a question of fact for the jury"); *Spitzberg*, 758 F.3d at 689 (same); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 473 (S.D. Tex. 2016) (same).[4]

***Second***, Defendants also contend that investors should have divined that CrowdStrike did not test Rapid Response updates because the Company stated in voluminous SEC Form 10-Ks that Falcon provides "real time" protection and because "testing software updates takes 'a significant amount of time.'" MTD at 24. But nowhere in its Form 10-Ks or elsewhere did CrowdStrike tell investors that it did not test Rapid Response updates, or that Defendants were achieving "real time" protection by sacrificing testing. It is precisely because Defendants did not publicly disclose these facts that industry experts and investors were stunned to learn the truth. And Defendants' suggestion that their failure to test Rapid Response updates was a defensible way to achieve "real time" protection cannot be reconciled with their ultimate admission they "***acted horribly wrong***."

In any event, Defendants' argument that investors would have pieced together the truth from voluminous disclosures—a so-called "truth-on-the-market defense"—is "intensely fact-specific" and disfavored at the motion to dismiss stage, as Defendants cannot show that any "corrective information was conveyed to the public with a degree of intensity and credibility

---

[4] Defendants also point to self-serving statements made by Adam Meyers during CrowdStrike's congressional testimony that "content updates" are supposedly not software, and that CrowdStrike did subject *some* of its software updates to testing. MTD at 17. But Meyers also admitted that content updates (which *are* software updates) "had not previously been treated as code", and that "the *new* methodology is to test all of the content updates internally before they're released to the early adopters." D.Ex. Q at 19, 21; *see also* ¶¶66, 94. These admissions corroborate Plaintiff's allegations attributed to former employees that CrowdStrike did not subject updates to pre-production testing (¶¶61-65), and Defendants' reliance on other, self-serving statements from their congressional testimony is improper. *See* Pl's Opp. to Defs' Request for Judicial Notice. at 10-12.

sufficient to counterbalance effectively any misleading information created by the allegedly false and misleading statements." *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013) (whether disclosures "dissipated the effects of misstatements … is a matter for trial").

*Third*, Defendants contend that the Court should rule as a matter of law that CrowdStrike's statement that it deployed updates to a "staging environment that closely resembles the production environment" is not actionable because, according to them, the statement concerned customers' updating their code—not CrowdStrike updating its code. MTD at 12-13. But *even accepting* Defendants' interpretation, a reasonable investor would understand that statement to assert that CrowdStrike practiced what it preached. ¶¶145-46. At most, Defendants raise a fact dispute over what a reasonable investor would understand. *See Six Flags*, 58 F.4th at 218.

Defendants apply the same flawed logic in arguing that Kurtz was referring exclusively to customer code when he stated that CrowdStrike "ma[d]e sure that code is secure, that its deployed and that its run in a secure environment." MTD at 14. Likewise, they argue that CrowdStrike was referring exclusively to how customers use Falcon to test their own updates when it stated that they "programmatically build hundreds of detections, test those in non-production environments, and roll them out." MTD at 15-16. Defendants again impermissibly ask the Court to take them at their word that no reasonable investor understood them also to refer to CrowdStrike's own update testing. *Kunzweiler*, 2002 WL 1461732, at *10-11; *Venator*, 547 F. Supp. 3d at 656.[5]

*Fourth*, Defendants contend that Kurtz's statement to investors that, "We test more than

---

[5] Defendants' assertion that "[t]he Complaint does not allege that the July 19 incident was in any way related to the CI/CD software development process" also fails. MTD at 13. As reported by FE 3, CrowdStrike's deficient testing led to a breakdown in the CI/CD pipeline. ¶67. *See In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 666 (N.D. Tex. 2013) (declining to "choose between two competing views" of falsity allegations at motion to dismiss stage).

anyone else," was not false or misleading because he supposedly was only referring to "third-party testing," not CrowdStrike's. MTD at 19-20. Yet again, Defendants attempt to rewrite their disclosure, which stated that "*we* test more than anyone else," without any reference to third parties and without disclosing that testing for updates was non-existent. At most, Defendants' self-serving characterization of Kurtz's statement raises a factual dispute that cannot be resolved at the motion to dismiss stage. *Spitzberg*, 758 F.3d at 689; *Cannon*, 184 F. Supp. 3d at 473. Also without merit is Defendants' assertion that Kurtz's statement to investors that "we test more than anyone else" was "puffery"—immaterial fluff. Courts hold that determinations of materiality are fact-intensive and "usually left for the jury." *Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 746 (N.D. Tex. 2007). Plus, statements are not puffery when the Complaint "allege[s] specific facts to show that [d]efendants' statements were belied by" circumstances at the time. *See Rougier*, 2019 WL 6111516, at *10. CrowdStrike did *not* "test more than anyone else"—to the contrary, it failed to test consistent with its competitors (including Sentinel One) and the industry. ¶46.

*Fifth*, Defendants urge the Court to find, as a matter of law, that CrowdStrike misled no one and omitted nothing when it represented in its Form 10-Ks that the Company's "technical staff … tests our software on a *regular basis*" and maintains a "*regular release process*" for updates. MTD at 19. But in truth, it did *not* test its updates on a "*regular* basis"—in fact, it did not test them at *all*. Nor did CrowdStrike have a "*regular release process*" for its updates—indeed, it had no "process" at *all*, beyond simultaneously thrusting them upon all customers the moment they were complete. "[T]here were stark differences between the image [CrowdStrike] projected and the reality of [its] operations." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 758 (S.D. Tex. 2012).[6]

---

[6] Defendants' authorities are inapposite. In *Linenweber v. SouthWest Airlines Co.* (MTD at 19), statements about an airline's "regular maintenance checks" were not actionable because plaintiffs

*Finally*, Defendants contend that the Complaint supposedly fails to allege the existence of an industry standard for pre-production testing during the Class Period. MTD at 25-26. Not so. The Complaint includes the accounts of dozens of industry experts, who explained how, because pre-production testing is well-established as the industry standard, they were "*slack-jawed in horror*" to learn CrowdStrike lacked the testing it "should have had … in the first place." ¶¶11, 92. Plus, Kurtz himself acknowledged more than a decade before the Class Period that "*you should always try your [software] changes in a test environment*," and the NIST codified pre-production testing into its standards *over a decade ago*. ¶¶5, 37; D. Ex. Y at i.

### 3. Defendants Misled Investors Into Believing That CrowdStrike Conducted Phased Deployments Of Its Rapid Response Updates

Defendants further misled investors by representing that CrowdStrike prevented widespread blue screens because "for system stability, *we always do canary deployments of new services before rolling out changes to the entire fleet*." ¶139. But CrowdStrike did *not* conduct phased rollouts of Rapid Response updates and, as a result, its entire customer base was unknowingly subject to a heightened risk of blue screens. ¶140.

CrowdStrike tries yet again to explain away its misrepresentation through its own counterfactual narrative. According to Defendants, investors already knew that CrowdStrike did not perform canary deployments of Rapid Response updates—despite CrowdStrike having told them the exact opposite ("we *always* do canary rollouts"). Defendants again point to a statement in their

---

only alleged that the airline operated several aircraft with safety deficiencies, which was not inconsistent with conducting "regular checks." 693 F. Supp. 3d 661, 678-81 (N.D. Tex. 2023). And in *In re Plains All American Pipeline, L.P. Securities Litigation* (MTD at 19), a statement that the company used "state-of-the-art inspection tools" was not actionable because plaintiffs only alleged the tools were ineffective, and the statement did not guarantee tools "were 100 percent effective." 307 F. Supp. 3d 583, 623-24 (S.D. Tex. 2018). Here, Plaintiff does *not* allege that CrowdStrike's testing and release processes were "irregular" or "ineffective." Rather, Plaintiff alleges that CrowdStrike represented it conducted "regular" testing and releases when, in reality, it had *no* testing or release procedures for its updates *at all*.

23

Form 10-Ks that they deliver updates in "real time." MTD at 24. But nothing about their stated commitment to "real-time" protection (or any of their other disclosures) remotely trumps their representation that "we *always* do canary deployments," or informed investors that, in delivering "real-time" updates, CrowdStrike shirked the industry-standard practice of phased rollouts.

Reactions from industry experts further undermine, and cannot be reconciled with, Defendants' counter-factual narrative. When the public first learned that CrowdStrike did not "do staged, 'canary' deployment," industry experts expressed surprise, explaining that they were "*slack jawed in horror*" by this revelation, noting that phased rollouts are the subject of "*first-year programming student*" curriculum. ¶92. If CrowdStrike *had* forewarned customers, and if investors *had* been told that CrowdStrike did not conduct phased rollouts, there would have been no surprise and nothing for Defendants to have admitted they got "*horribly wrong*."

Defendants fare no better by arguing that investors would understand their representations about "always do[ing] canary deployments" as excluding Rapid Response updates. Contrary to Defendants' assertion, a Rapid Response update *is* a "new service"—it serves to protect customers against *new* threats. Plus, *even if* their statement could be understood as excluding Rapid Response updates (and it cannot), it would *still* be misleading to tell investors that CrowdStrike "always do[es] canary rollouts for new services," *without* telling investors the "whole truth," including that it *never* does canary rollouts for new Rapid Response updates. *Anadarko*, 514 F. Supp. 3d at 956.[7]

### 4.    Defendants Misled Investors To Believe That CrowdStrike Adhered To FedRAMP And DoD Compliance Standards

Defendants further misled investors during the Class Period by representing that CrowdStrike was "*meeting the stringent requirements*" of FedRAMP and of the DoD. ¶¶51-56.

---

[7] Defendants also claim that "CrowdStrike disclosed that content updates were transmitted" to all customers "simultaneously." MTD at 24. This is pure fiction. Defendants' filings nowhere state how quickly updates were rolled out, let alone that such releases were "simultaneous."

In reality, CrowdStrike was not. It failed to, among other things, test its updates in a pre-production environment "to ensure that activities in the test environment do not impact activities in the operational environment." ¶¶37, 80-85.

False representations that a company is meeting regulatory requirements are actionable under the securities laws. For example, in *Equifax*, the court found actionable Equifax's misstatements that it "compl[ied] with applicable regulations" concerning data protection. 357 F. Supp. 3d at 1227. Similarly, in *Todd v. STAAR Surgical Co.*, the court found actionable defendants' misstatement that the company was "substantially in compliance with the FDA's … regulations." 2016 WL 6699284, at *3, 11 (C.D. Cal. Apr. 12, 2016).

Defendants' arguments fail. *First*, they did not merely tell investors that CrowdStrike held "FedRAMP and DoD authorization." MTD at 22. Rather, they represented that it was "*meeting*" FedRAMP and DoD "requirements" when it was not. ¶¶141-44. Defendants' effort to rewrite the challenged misstatements speaks volumes.

*Second*, Defendants mistakenly contend that investors somehow would have figured out that CrowdStrike was *not* meeting FedRAMP's complete set of requirements—despite their unequivocally telling investors that "we *are* meeting the stringent requirements." MTD at 23. But Defendants did not limit the "stringent requirements" that CrowdStrike purportedly "met" to only those applicable to the "moderate" impact level. ¶141. Nor did CrowdStrike's *separate* statement that it had, as of that point, sought "Moderate" FedRAMP authorization remotely disclose that it was *not* meeting other FedRAMP requirements. Defendants' arguments as to how investors would have understood their various statements, at most, raise factual disputes that cannot be resolved as a matter of law on a motion to dismiss. *See Cannon*, 184 F. Supp. 3d at 473 (rejecting defendants' argument that statement could not be understood as referring to a "production plant as a whole,

25

not merely to a specific subpart"); *Venator*, 547 F. Supp. 3d at 656 (rejecting defendants' argument because it was "conceivable" that "a reasonable investor would have understood" statements to refer to "total production capacity" and not just the "finishing [stage]" of production).

Notably, Defendants' argument ignores that CrowdStrike *also* specifically told investors during the Class Period that it was "FedRAMP *High*-Impact Level *Ready*."[8] Accordingly, there is no basis to conclude—particularly at the pleading stage—that a reasonable investor would have understood their statement as limited to a subset of FedRAMP's "moderate" requirements. Such factual disputes can only be resolved at "a later stage of this litigation." *Spitzberg*, 758 F.3d at 689.

*Finally*, Defendants contend that NIST SP 800-53 AC-5 "does not require" a dedicated quality assurance team to conduct testing, but merely *suggests* that testing be handled by dedicated staff. MTD at 23. Defendants point to no language in AC-5 supporting the interpretation that its non-inclusive list of "system support functions" *requiring* administration by "different individuals," including for "quality assurance and testing," was a mere suggestion. ¶40 n.29. The parties' competing interpretations of AC-5 boil down to a factual dispute which, again, is unfit for resolution on the pleadings. *See SolarWinds*, 595 F. Supp. 3d at 588 (declining to resolve "a factual dispute not appropriate for resolution in a motion to dismiss.").

### 5.    Defendants Misled Investors To Believe That CrowdStrike Employed A Dedicated Quality Assurance Team

Defendants also misled investors by representing that CrowdStrike had a "quality assurance team." ¶¶50, 136. In truth, CrowdStrike did not have a quality assurance team—a fact that its employees found "baffling." ¶71; *see also SolarWinds*, 599 F. Supp. 3d at 586-88 (statements that SolarWinds employed a dedicated "security team" actionable when former

---

[8] *See, e.g.*, Andre Murphy, *CrowdStrike Achieves FedRAMP JAB High "Ready" Designation*, CrowdStrike Blog (Dec. 4, 2023), https://www.crowdstrike.com/en-us/blog/crowdstrike-designated-fedramp-jab-high-ready/.

employees reported that no such team existed).

Defendants make much ado about the fact—which Plaintiff has never contested—that CrowdStrike asserted that it maintained a "quality assurance team" in the context of describing product "accessibility." MTD at 9-10. But nowhere in the challenged statement—or anywhere else in the Proxy or CrowdStrike's other filings—did the Company tell investors that it *only* had a quality assurance team for accessibility testing. To the contrary, the Company's Proxy stated—without limitation—that "*our* quality assurance team is *also* trained and equipped to assist with testing for accessibility." ¶50. This statement does not state or imply that CrowdStrike's "quality assurance team" was limited exclusively to "testing for accessibility" for the "visually impaired."

**B.    Plaintiff Has Adequately Alleged A Strong Inference of Scienter**

Plaintiff also alleges a strong inference of "scienter"—i.e., that Defendants were aware of, or severely reckless in not knowing, the undisclosed facts. As the Fifth Circuit has long held, a plaintiff may plead scienter by alleging an "intent to deceive" *or* "severe recklessness." *See Spitzberg*, 758 F.3d at 684. "Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation." *In re Fleming Comps. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *10 (E.D. Tex. June 16, 2004). The Exchange Act "neither mandate[s] nor prohibit[s] *any* particular method of establishing a strong inference of scienter." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410-11 (5th Cir. 2001). The Fifth Circuit does not require "direct evidence of scienter in order to withstand dismissal." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003). "[C]ircumstantial evidence" is enough. *Nathenson*, 267 F.3d at 410.

Importantly, the scienter inference "need *not* be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). It is enough that, when considering "all the facts and circumstances alleged … *in toto*," the inference is "cogent and at least as compelling as any opposing inference

27

one could draw from the facts alleged." *Goldstein*, 340 F.3d at 246. The Court must accept the Complaint's scienter allegations as true, draw all inferences in Plaintiff's favor, and consider the allegations holistically, rather than separately. *Tellabs*, 551 U.S. at 322-23. Viewed holistically, as it must be, the Complaint raises a strong inference of scienter.

***The misstatements concerned CrowdStrike's only product.*** Defendants recognized that CrowdStrike's entire financial wellbeing depended on its ability to "convince potential customers to allocate a portion of their discretionary budgets to purchase our Falcon platform," with it "***at the core of everything we do***." ¶98. Defendants, in turn, emphasized that Rapid Response updates were central to Falcon's value proposition and that CrowdStrike was winning business because customers supposedly could ***avoid*** "outages caused by sensor updates" by choosing Falcon. ¶32.[9]

The significance of Falcon's update program to CrowdStrike's bottom-line supports the inference that Defendants were at least severely reckless in not knowing that CrowdStrike did not test and safely release its Rapid Response updates. *See Stone*, 26 F. Supp. 3d at 600 ("[W]hen a company is a single-product company … the gravity of misrepresentations about the product to the public is strong evidence that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."); *Nathenson*, 267 F.3d at 424-25 (scienter where defendant "was essentially a one product company"); *Venator*, 547 F. Supp. 3d at 664-65 (that one product made up for 73% of sales "supports a strong inference of scienter").

***CrowdStrike severely departed from the most basic industry standards governing the update process.*** Testing updates in pre-production environments and phased rollouts are among

---

[9] While Defendants note in their motion that "the Falcon platform ***includes*** numerous discrete products that can be purchased separately" (MTD at 33), this just proves Plaintiff's point. Customers could ***only*** purchase additional capabilities if they already had Falcon. And ***all*** Falcon customers were subject to Rapid Response updates, and the risks associated with them.

the most basic and well-established industry requirements. ¶¶103-04. Industry participants were "*astounded*" and "*slack-jawed in horror*" and found it "*unconscionable*" that CrowdStrike would forgo basic measures that the Company "*should have had in the first place*," and that even "*[f]irst-year programming students*" understood to be fundamental. ¶¶80-84, 90-96. Kurtz demonstrated his awareness of pre-production testing as a fundamental industry standard, writing in his book on cybersecurity that "*you should __always__ try your changes in a test environment*." ¶37. That Defendants disregarded the most basic industry standards and "the potential magnitude of the damage" that could result supports, at minimum, severe recklessness. *BP*, 843 F. Supp. 2d at 790; *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) ("relative simplicity" of principles that were violated supported strong inference of scienter).

*Defendants had prior, first-hand experience with system crashes resulting from the release of faulty updates that were not properly tested.* Under Defendants' executive leadership, McAfee distributed a faulty software update that caused tens of thousands of computers across the world to "blue screen." ¶101. As in this case, McAfee admitted that the release of the faulty update was a failure of its quality assurance processes. *Id.* Industry experts' observations were nearly identical to those of experts after the CrowdStrike outage: McAfee would have avoided the crash with "*very basic testing*" including testing on "one machine to test it first *before rolling out to the whole fleet*." *Id.* Kurtz assured investors that a similar outage would not occur at CrowdStrike, telling them specifically that they had "*learned this lesson … at McAfee*." ¶102.

In their motion, Defendants misread the Complaint and the law, claiming that the prior failed updates do not support an inference of recklessness because the Complaint does not allege whether the same issue caused both the prior crashes and the July 19 outage. MTD at 31. The Complaint alleges that, just like the July 19 outage, Defendants' prior outages were caused by "*a*

*flawed update*" that caused "*systems to crash and prevented them from rebooting normally*." ¶111. That is why industry experts remarked, "*[t]he parallels between that [McAfee] incident*" and the outage were "*uncanny*," and the Linux failures "*indicated that the laxity in CrowdStrike's Falcon Sensor software has persisted for some time*." ¶¶102, 111. It is enough that the Complaint plead facts supporting the inference that Defendants were "severely reckless in ignoring the truth." *ArthroCare*, 726 F. Supp. 2d at 718; *see also In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1358-59 (S.D. Fla. 2005) (scienter where "the errors … were too obvious to ignore" and defendant should "have been at least suspicious").

As this Court found in *SolarWinds*, where a massive hack revealed misstatements concerning cybersecurity, the plaintiff "need not plead that [a prior] incident directly caused the later breach" for allegations about that incident to demonstrate severe recklessness. *SolarWinds*, 595 F. Supp. 3d at 579-85. The same reasoning applies here: Defendants' personal experiences at McAfee and prior failed updates at CrowdStrike demonstrate that they "were at least reckless in not realizing that something was dangerously amiss." *Id.* at 584-85.

***Defendants admitted they "did things horribly wrong" and instituted the very update testing and rollout procedures they had repeatedly assured investors were already in place.*** The scienter inference is strengthened by the fact that, shortly after the July 19 outage, Defendants admitted they did "things horribly wrong." ¶¶92-94, 116. They likewise admitted that, for the first time, CrowdStrike would test all Falcon updates in pre-production environments, and would roll such updates out in phases. *Id.* This is not mere "fraud by hindsight"[10]; that Defendants so quickly and easily implemented the industry-standard testing and release protocols they previously lacked

---

[10] *Heck v. Orion Group Holdings, Inc.* (*see* MTD at 26) is inapposite. There, what the plaintiff characterized as "admissions" were just "reports of bad news." 468 F. Supp. 3d 828, 854 (S.D. Tex. 2020). Defendants here admitted their own "horribl[e]" wrongdoing. ¶¶92-94, 116.

supports the recklessness inference. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("[A]llegations of later-emerging facts can … provide warrant for inferences about an earlier situation."); *BP*, 843 F. Supp. 2d at 783-84 (post-incident admission that it was "an entirely fair criticism" to blame BP for the poor cleanup effort supported scienter).

*Kurtz and Sentonas held themselves out as personally knowledgeable and repeatedly spoke on the subjects of CrowdStrike's update testing and stability.* Kurtz and Sentonas specifically spoke to investors about how Falcon updates worked and how they were tested. ¶¶99-100. For example, Sentonas flatly told investors that Falcon software "*doesn't blue screen endpoints with failed updates*," which was "*one of the most important things*" to customers. *Id.* Kurtz further assured investors that "*[t]esting and validation is really important*" at CrowdStrike and "*[w]e test more than anyone else*." *Id.* That Defendants made numerous statements in which they held themselves out as knowledgeable on these topics strengthens the inference that, at minimum, Defendants were severely reckless in not knowing the truth. *BP*, 843 F. Supp. 2d at 784 & n.37; *SolarWinds*, 595 F. Supp. 3d at 586 ("[T]hat the cybersecurity measures at SolarWinds were not as strong as Brown repeatedly represented during the class period, support the [c]ourt's conclusion that [p]laintiffs have plausibly asserted the element of scienter.").

*Defendants signed sworn certifications of CrowdStrike's compliance with FedRAMP and DoD security requirements.* CrowdStrike's FedRAMP and DoD certifications, signed by Kurtz and Sentonas, included a duty to monitor. ¶¶106-07. Either they investigated and discovered the egregious deficiencies or failed to do so—both demonstrate scienter. *Fleming*, 2004 WL 5278716, at *11 ("fail[ure] to check information they had a duty to monitor" establishes scienter).[11]

---

[11] Defendants also argue that Plaintiff does not sufficiently allege that Kurtz and Sentonas signed such certifications. MTD at 33. But Plaintiff sufficiently attributed the signing of these

***Defendants were warned by CrowdStrike employees.*** For example, FE 5 observed CrowdStrike's lack of focus on testing and quality assurance, and sent a video message directly to Kurtz and Sentonas. ¶109. FE 5's account is corroborated by the *Semafor* report, which detailed how CrowdStrike employees warned Defendants that they were "***releasing products that couldn't be supported***" and that there was ***no "quality control***." ¶110. These warnings further strengthen the scienter inference. *See Lormand*, 565 F.3d at 252-53 (scienter when employees "had privately protested" against practices); *Venator*, 547 F. Supp. 3d at 663-64 (allegations that defendant "received" knowledge of falsity of statements demonstrate scienter).

Defendants erroneously assert that FE 5's message sent directly to Kurtz and Sentonas should be ignored because it is "hearsay." MTD at 29. Even if FE 5's account was based on hearsay (and it is not[12]), "hearsay" accounts ***do*** contribute to an inference of scienter at the pleading stage. *Six Flags*, 58 F.4th at 216 n.18 (crediting former employee with no direct contact with defendants, noting "[a] confidential witness does not need to be a fly on every relevant wall—or directly deliver every relevant presentation—to plead allegations supporting an inference of scienter").[13]

Defendants also mistakenly assert that FE 5's video message—which warned that engineers were unable to "address critical issues" because of a lack of support (¶¶74, 109)—is "irrelevant." MTD at 29. But the Complaint sufficiently alleges that FE 5's warning, combined with warnings noted in the *Semafor* report, supports severe recklessness, at minimum. *See*

---

certifications to Defendants and CrowdStrike's executives. ¶¶55, 107 ("***Defendant Kurtz*** or someone else in the C-Suite, ***including Defendant Sentonas***, had to sign certifications.").

[12] A statement made by a party opponent is not hearsay. Fed. R. Evid. 801(d)(2)(A). In any event, "hearsay" is a rule of evidence that governs admissibility of ***proof at trial***—it does not control what facts can support an inference at the pleading stage.

[13] Defendants' authority pre-dates *Six Flags* and concerned "quadruple hearsay," which was plaintiff's "best piece of [scienter] evidence," unlike the allegations here. *See Schulze v. Hallmark Fin. Servs., Inc.*, 2021 WL 3190529, at *5 & n.41 (N.D. Tex. July 28, 2021).

*Lormand*, 565 F.3d at 251 (the "inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter.").[14]

Defendants mistakenly contend that the *Semafor* article should be ignored because it is "unreliable" and "hearsay." MTD at 30-31. As courts have explained, the accuracy of such articles "is not a proper subject for a motion to dismiss." *See In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *4 (S.D. Tex. Jan. 19, 2016); *see also In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *7-8 (W.D. Pa. May 18, 2023) (crediting allegations based on investigative news articles). The *Semafor* article is corroborated by the FE accounts, Defendants' post-Class Period admissions, and the stunned reactions of industry experts in the Complaint—all of which demonstrate its reliability. *Six Flags*, 58 F. 4th at 208-09, 216 n.18 (crediting FE accounts supported by "corroborating evidence," and noting that "hearsay" allegations can support scienter); *KB Partners I, L.P. v. Barbier*, 907 F. Supp. 2d 826, 831 n.2 (W.D. Tex. 2012) (same).

### 1. Defendants' Competing Inference Based On Their Distorted Version Of The Complaint Is Not More Compelling

To defeat Plaintiff's scienter inference, Defendants bear the heavy burden of offering a ***more*** compelling inference based on the Complaint's allegations. The Fifth Circuit has emphasized that "a tie favors the plaintiff" and scienter allegations need only be "at least as likely as any plausible opposing inference.'" *Lormand*, 565 F.3d at 250, 254. The Court "must … accept all factual allegations in the complaint as true," (*id.* at 232) and Defendants cannot try to defeat the scienter inference by "introduc[ing] disputed facts through judicial notice at the dismissal stage in a motion to dismiss." *Miller v. Stroman*, 2020 WL 2494576, at *3 (W.D. Tex. May 14, 2020).

Importantly, Defendants ***do not contest that they knew*** CrowdStrike had cast aside the

---

[14] Defendants' authority is inapposite. *See, e.g.*, *Owens v. Jastrow*, 789 F.3d 529, 544 (5th Cir. 2015) (employee warning that did not mention GAAP insufficient for scienter of GAAP violation).

industry-standard quality control practices described above: they maintain that doing so was "***appropriate***." MTD at 5 n.3. Nevertheless, Defendants insist the Court adopt their preferred inference because only insider trading can demonstrate scienter. MTD at 28. That is not the law. The Supreme Court and Fifth Circuit are clear: severe recklessness does not depend on "the presence or absence of a pecuniary motive." *Spitzberg*, 758 F.3d at 685; *Tellabs*, 551 U.S. at 325. Moreover, Plaintiff states a cogent explanation of what Defendants did and why: they prioritized speed over the safety of updates to maintain Falcon's competitive marketing edge. ¶¶112-13. This was a reckless calculation that the likelihood of a failed update was low, while the benefits of speed were high. Until July 19, the gamble worked, and CrowdStrike doubled its stock price. ¶¶57-58.

The Complaint does not, as Defendants claim, allege a theory that Defendants intentionally "embark[ed] on a path to self-destruction." MTD at 35. As Judge Posner explained in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, scienter includes "a reckless, gamble." 513 F.3d 702, 710 (7th Cir. 2008). In *Six Flags*, the Fifth Circuit applied Judge Posner's "reckless gamble" analysis, crediting the inference that defendants were motivated to conceal information to their detriment because, "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." 58 F.4th at 215; *In re Apache Corp.*, 2022 WL 4277350, at *7 (S.D. Tex. Sept. 15, 2022) (same). As alleged, Defendants took a reckless gamble here too.

Such a gamble is not a motive "common to any corporate executive." MTD at 28. There is a clear distinction between the benign motivation to grow a business, like in Defendants' cases, and a reckless decision to conceal an inconvenient truth and hope things work out. Defendants recklessly calculated that a failed update was unlikely, and that the benefits of releasing updates quickly and without testing outweighed that risk. ¶¶75, 110. By concealing the reckless gamble

34

they took, their conduct violates the federal securities laws whether they sold stock or not.[15]

### 2.    Defendants' Arguments As To CrowdStrike's Website Statements Fail

Defendants argue that Plaintiff does not allege that "Kurtz and Sentonas made, approved, or were even aware of" statements on CrowdStrike's website. MTD at 34. This is wrong. In *SolarWinds*, this Court attributed website statements to defendants relying on the same allegations here: that defendants "reviewed, approved, and controlled" the contents of the website. 595 F. Supp. at 590-91; ¶138; *see also In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (defendants that "possessed the power and authority to control [website] contents" were "maker[s]"). And FE 8's report that Kurtz and Sentonas "specifically directed that certain information be published on CrowdStrike's website" corroborates these allegations. ¶138 n.179. As in *SolarWinds*, Kurtz and Sentonas "held [themselves] out as a responsible and knowledgeable authority" concerning the "testing" of Falcon's updates. 595 F. Supp. at 584, 591.

### C.    Plaintiff Has Sufficiently Alleged Section 20(a) Claims

Defendants do not challenge (nor could they) that Kurtz and Sentonas controlled CrowdStrike and, thus, are liable under Section 20(a) for its primary violations. MTD at 35.

### V.    CONCLUSION

Defendants' motion to dismiss should be denied. If the Court grants the motion in whole or in part, Plaintiff respectfully requests leave to amend under Rule 15(a), which "requires the trial court to grant leave to amend freely." *SolarWinds*, 595 F. Supp. 3d at 594.

---

[15] Defendants' argument that they felt "justified" in failing to sufficiently test updates (MTD at 35) does not inoculate concealing their decision from investors. *Spitzberg*, 758 F.3d at 686 ("Subjective beliefs ... are irrelevant" for recklessness); *Fitzpatrick v. Uni-Pixel, Inc.*, 2014 WL 3773553, at *16 (S.D. Tex. July 25, 2014) (under *Spitzberg*, "what defendants actually believed [is] irrelevant to whether plaintiffs have alleged that defendants' false and misleading statements were severely reckless"). This supposed justification is also belied by Defendants' decision to implement pre-production testing of content updates after the outage. ¶¶90-96.

35

Dated: May 30, 2025

Respectfully submitted,

*/s/ Hannah Ross*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Hannah Ross
John Rizio-Hamilton
Scott R. Foglietta
Thomas Sperber
Sarah Schmidt
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
johnr@blbglaw.com
scott.foglietta@blbglaw.com
thomas.sperber@blbglaw.com
sarah.schmidt@blbglaw.com

*-and-*

Jonathan D. Uslaner
2121 Avenue of the Stars, Suite 2575
Los Angeles, California 90067
Telephone: (310) 819-3481
jonathanu@blbglaw.com

*Lead Counsel for Lead Plaintiff Thomas P.
DiNapoli, Comptroller of the State of New York,
as Administrative Head of the New York State and
Local Retirement System, and as Trustee of the
New York State Common Retirement Fund*

**MARTIN & DROUGHT, P.C.**
Gerald T. Drought
State Bar No. 06134800
Federal Bar No. 8942
Frank B. Burney
State Bar No. 03438100
Weston Centre
112 E. Pecan Street, Suite 1616
San Antonio, Texas 78205
Telephone: (210) 227-7591
Facsimile: (210) 227-7924
gdrought@mtdlaw.com
fburney@mtdlaw.com

36

*Liaison Counsel for Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement System, and as Trustee of the New York State Common Retirement Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2025, a true and correct copy of the foregoing document was served via the Court's electronic CM/ECF filing system, which will send an electronic notification of such filing to all counsel of record.

*/s/ Hannah Ross*_____
Hannah Ross